UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>**Plaintiffs,**<br><br>-against-<br><br>PRISTINE RX CORP, MARGARITA BABADZHANOVA, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,<br><br>**Defendants.** | CIVIL ACTION<br><br>24-CV-6585<br><br>COMPLAINT<br><br>(JURY TRIAL DEMANDED) |

Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (interchangeably referred to herein as "Plaintiffs" and "Allstate"), by their attorneys Manning & Kass, Ellrod, Ramirez, Trester LLP, for their Complaint against Defendants Pristine RX Corp ("Pristine RX") and Margarita Babadzhanova ("Babadzhanova") (Pristine RX and Babadzhanova are collectively referred to as, "Pharmacy Defendants"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively, "Defendants") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least 2020 and continuing through the filing of this Complaint, Defendants engaged in a massive scheme to defraud Allstate, through the exploitation of New York's Comprehensive Motor Vehicle Insurance Reparations Act (popularly known as the "No-fault Law").

2.      Pursuant to the No-fault Law, policyholders and others who suffer injuries in automobile accidents ("Covered Persons") can obtain payments from the policyholders' automobile insurance companies, including Allstate, for necessary medical care ordered by the Covered Persons' physicians or prescribing providers.  Covered Persons are also permitted to

assign those benefits to doctors and other licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

3.     This action seeks to recover more than $105,000.00 that Defendants stole from Plaintiffs, and other economic injuries suffered by Allstate which flowed directly from the submission of hundreds of false and/or fraudulent insurance claims, seeking reimbursement for specifically-targeted, medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Products and a limited variety of other oral medications.

4.     As part of the scheme to defraud alleged herein, the Pharmacy Defendants entered into illegal kickback arrangements with No-fault clinics in the New York metropolitan area (the "Prescribing No-fault Clinics" or "No-fault Clinics") and unlicensed laypersons who work at or are associated with the No-fault Clinics ("Clinic Controllers") pursuant to which the No-fault Clinics prescribed expensive, pre-formulated Topical Pain Products, gels, lotions, ointments, and patches dispensed and billed in exorbitant prices by Pristine RX, such as Lidocaine 5% ointment and Lidocaine 5% Pain Patches (the "Topical Pain Product"), as well as a select few oral medications, primarily in the form of a limited variety of nonsteroidal anti-inflammatories ("NSAIDs"), such as Celecoxib, Ibuprofen, Meloxicam, and Naproxen and a limited variety of muscle relaxers, such as Cyclobenzaprine and Tizanidine.   Pursuant to the illegal kickback arrangements, these medications were routinely prescribed to Covered Persons, rather than commercially available and more affordable over-the-counter medications and pain creams that have been approved by the FDA.  Pristine RX targeted the Topical Pain Products and other select oral medications rather than the cheaper over-the-counter alternatives for no other purpose than to submit fraudulent, inflated bills to Allstate for reimbursement, exploiting the Covered Persons for financial gain, without regard to genuine patient care.

2

5.      In furtherance of Defendants' scheme to defraud, Covered Persons who were purportedly involved in automobile accidents would present to the Prescribing No-fault Clinics where they would, as a matter of pattern, practice and protocol, be prescribed certain medications specifically targeted for their high profit margins, including Topical Pain Products and/or a limited variety of other medications such as NSAIDs or muscle relaxers, irrespective of medical necessity.

6.      The prescriptions, which were issued by Prescribing No-fault Clinics and sent to Pristine RX for dispensing and billing, for dispensing and billing, for dispensing and billing, were, in numerous instances, tailored to boilerplate, pre-printed examination reports designed to limit the prescribing providers' prescriptions to a predetermined treatment protocol, and justify continued, voluminous and excessive use of prescribed pharmaceuticals, including the Topical Pain Creams and other select oral medications.

7.      To effectuate the scheme and maximize profits, the Pharmacy Defendants dispensed a handful of specific pain medications, including the Topical Pain Products and a select few oral NSAIDs and muscle relaxers, based solely on the medications' exorbitant pricing and high profit margins.  In exchange for kickbacks and financial incentives and pursuant to collusive, illegal arrangements, Defendants induced the Prescribing No-fault Clinics, Clinic Controllers, and prescribing providers to prescribe these targeted, exorbitantly priced pain medications, including the Topical Pain Products and other select NSAIDs and muscle relaxers, without regard to genuine patient care, and directed large volumes of these prescriptions to Pristine RX.

8.      Once the Topical Pain Products and/or other oral medications were prescribed, if the pharmaceuticals were dispensed at all, they were either given to Covered Persons directly at the Prescribing No-fault Clinics or mailed to the Covered Persons from Pristine RX.  Covered Persons were not given any choice as to where their prescriptions would be filled.

9.     When the Pharmacy Defendants purported to provide the Topical Pain Products and/or other medications to Covered Persons covered by Allstate, Pristine RX sought reimbursement directly from Allstate pursuant to executed "Assignment of Benefit" ("AOB") forms and New York State Department of Insurance claim form ("NF-3"), often with additional forms listing each billed-for pharmaceutical by its national drug code ("NDC")[1] number.

10.     The Pharmacy Defendants also never submitted wholesale purchase invoices to Allstate demonstrating the NDC number for the pharmaceuticals Pristine RX obtained and how much Pristine RX actually paid the suppliers for these pharmaceuticals or whether Pristine RX actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

11.     At all relevant times mentioned herein, nearly each and every bill mailed to Allstate by Babadzhanova through Pristine RX sought reimbursement for Topical Pain Products or other select NSAIDs and muscles relaxers that the Pharmacy Defendants could readily buy at a low cost and bill to Allstate at inflated amounts based on egregiously high wholesale prices.  Defendants steered the Prescribing No-fault Clinics and prescribing providers to prescribe these pharmaceuticals specifically because of their high profit margins, irrespective of medical necessity, pharmacological outcome, or genuine patient care and despite the availability of cheaper over-the-counter and FDA-approved medications.

12.     On information and belief, by entering into kickback arrangements with the Prescribing No-fault Clinics for Topical Pain Products and/or a select number of oral medications, and by dispensing these Topical Pain Products and other medications irrespective of medical necessity pursuant to bogus prescriptions, Defendants engaged in conduct which demonstrated a

---

[1] A National Drug Code ("NDC") number is a unique 10-digit code that identifies each prescription drug product (whether brand name or generic) by the drug itself, the vendor of the drug and the quantity in which the drug was packaged.

blatant disregard for the laws of New York State which govern the proper operation of a pharmacy and the proper dispensing of drug products, as well as laws which prohibit illegal fee splitting and the solicitation of patients.

13.     By way of example and not limitation, New York Education Law § 6509-a, prohibits a professional licensee, such as a pharmacy, from directly or indirectly requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications, and 8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee, such as a pharmacy, from directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

14.     In addition, the Official Compilation of Codes, Rules and Regulations of the State of New York governing Official Prescriptions, Section 910.2(f), states that an order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations.

15.     The scheme to defraud orchestrated by the Pharmacy Defendants by which they routinely dispensed the Topical Pain Products and/or a limited variety of other medications, including NSAIDs and muscle relaxers, without regard to medical necessity, not only demonstrated a deliberate disregard for the laws of New York State in furtherance of theft from Allstate, but also posed a significant risk to the health of patients.

16.     Babadzhanova, through Pristine RX, fraudulently submitted, or caused to be submitted, bills to Allstate for Topical Pain Products and a select variety of oral medications, including NSAIDs and muscle relaxers, that were provided to Covered Persons (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.  By way of example and not limitation, annexed hereto as Exhibit "1" in the accompanying Compendium of Exhibits is a spreadsheets listing representative samples of claims Allstate paid to Pristine RX for Topical Pain Products and the select variety of oral medications that were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

17.     In each instance, the Pharmacy Defendants knew or should have known that the claims they submitted to Allstate were bogus and contained material and misleading statements regarding the propriety of the billed-for services.  In particular, the Pharmacy Defendants knew or should have known that the claims that they submitted to Allstate were for Topical Pain Products and a select variety of oral pain medications which were provided: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

18.     On information and belief, the Defendants willfully engaged in the practices alleged herein with the sole object of converting money.

19.     In addition to payments resulting from fraudulent claims, the fraudulent activities engaged in by Defendants caused Plaintiffs to suffer further economic injury, including, but not limited to, expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

20.     It was a foreseeable consequence of Defendants' scheme to defraud that Plaintiffs would incur expenditures in an effort to verify Defendants' fraudulent claims.

21.     At all times relevant herein, but-for the Pharmacy Defendants' fraudulent misrepresentations, Plaintiffs would not have incurred expenditures in an effort to verify Defendants' fraudulent claims.

22.     At all times relevant herein, Defendants' fraudulent misrepresentations directly and proximately resulted in Plaintiffs incurring expenditures in an effort to verify the Pharmacy Defendants' fraudulent claims.

23.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeering Influenced and Corrupt Organization Act ("RICO") applies.  The Defendants adopted a fraudulent blueprint regarding the dispensing of pharmaceuticals, including but not limited to Topical Pain Products, and a select variety of oral medications, including NSAIDs and muscle relaxers, as their business plan, and used it to participate in a systematic pattern of racketeering activity.  Every facet of Defendants' operations, from the creation of fraudulent bills, to the formation of kickback arrangements with

the Prescribing No-fault Clinics, to the illegal bulk dispensing of Topical Pain Products, to record keeping, to billing, was carried out for the purpose of committing fraud.

24.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for pharmaceutical products.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Pristine RX's claims for Topical Pain Products or the other select variety of oral medications, including NSAIDs and muscle relaxers, submitted to Plaintiffs for reimbursement because they were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.  By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of unpaid No-fault claims from Pristine RX of approximately $113,000.00, which form the basis of Plaintiffs' request for declaratory relief.  Said spreadsheet is grouped by claim number, date of service and the amount pending.

## STATUTORY/REGULATORY SCHEME

25.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other

properly licensed healthcare providers, including pharmacies, enabling them to bill insurance companies directly for their services.

26.     As alleged herein, the Pharmacy Defendants exploited and continue to exploit the No-fault Law by obtaining such assignments, and dispensing and billing for Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, that if provided at all, were medically unnecessary and provided pursuant to a fraudulent protocol in which in which virtually all Covered Persons were prescribed the Topical Pain Products and/or the select variety of oral medications irrespective of need and in violation of state and/or federal law.

27.     Pristine RX is ostensibly a licensed pharmacy that bills for pharmaceuticals provided to, among others, individuals covered under the No-fault Law.  In exchange for their services, Pristine RX accepted assignments of benefits signed by Covered Persons and submitted claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

28.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65, *et seq*., Pristine RX submitted bills for their claims to Plaintiffs using the claim form prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), known as a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form, or a substantially similar form.

29.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Pristine RX contained the following warning at the foot of the page:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime….

30.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

31.     Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a pharmacy, may recover for health service-related expenses.  In particular, under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

32.     Pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault law.  11 N.Y.C.R.R. § 68.1.

33.     Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") which is a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

34.     Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

35.     The maximum amount that a healthcare provider may charge for a medically necessary prescription drug or product pursuant to the No fault Law is based upon the drug's NDC number.

36.     Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

37.     For each generic drug, the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

38.     AWP is defined by 12 N.Y.C.R.R. § 440.2(a) as:

> The average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health or any successor publisher, on the day a prescription drug is dispensed or other nationally recognized drug pricing index adopted by the Chair or Chair's designee.

39.     On information and belief, Pristine RX was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

40.     On information and belief, Defendants intentionally targeted Topical Pain Products with extremely expensive AWPs in order to inflate the billing submitted through Pristine RX and to maximize their profits.

41.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, to the extent that they provided any Topical Pain Products at all.

## **NATURE OF THE ACTION**

42.     This action is brought pursuant to:

i)      The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1962(c);

ii)     New York State Common Law; and

iii)    The Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

## **NATURE OF RELIEF SOUGHT**

43.     Plaintiffs seek treble damages that they sustained as a result of the Defendants' schemes and artifices to defraud, and acts of mail fraud (pursuant to 18 U.S.C. § 1341), in connection with their use of the facilities of the No-fault system and its assignment of benefits mechanism to fraudulently obtain payments from Plaintiffs for pharmaceutical products, including but not limited to Topical Pain Products that they allegedly dispensed to individuals covered by Plaintiffs under New York State's No-fault Law.

44.     Plaintiffs seek compensatory and punitive damages under the Common Law.

45.     Plaintiffs further seek recovery of the No-fault claim payments made under the independent theory of unjust enrichment.

46.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Defendants' unpaid No-fault claims for Topical Pain Products and select other oral medications, including NSAIDs and muscle relaxers, which were dispensed pursuant to the fraudulent scheme set forth herein.

47.     As a result of Defendants' actions alleged herein, Plaintiffs was defrauded of an amount in excess of $105,000.00, the exact amount to be determined at trial, in the form of payments to Defendants and/or expenses incurred by Plaintiffs as a result of Defendants fraudulently billing Plaintiffs for Topical Pain Products and select other oral medications,

primarily in the form of oral pain relievers and muscle relaxants, that they knew or should have known were provided (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions.

## THE PARTIES

**A.**     **Plaintiffs**

48.     Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.     Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.     Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

51.     Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

52.     Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Allstate" or "Plaintiffs."

**B.**   **Defendants**

53.    Margarita Babadzhanova ("Babadzhanova") is a natural person residing in the State of New York, and is the principal record owner, officer and/or operator of Defendant Pristine RX, and at all times relevant herein, operated, managed, and/or controlled its activities.

54.    Defendant Pristine RX Corp ("Pristine RX") a New York corporation, formed on or about November 18, 2020, was first registered as a pharmacy with the New York State Office of Professions on February 25, 2021, and purports to operate its principal place of business at 55 West Old Country Road Hicksville, NY 11801.  Pristine RX is owned, operated, managed, and/or controlled by Defendant Babadzhanova and, at all relevant times mentioned herein, submitted fraudulent claims to Plaintiffs seeking reimbursement for pharmaceutical products under the No-fault Law.

55.    On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein.  These individuals will be added as Defendants when their names and the extent of their participation become known through discovery.

56.    On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as Defendants when their names and the full extent of their participation become known through discovery.

## JURISDICTION AND VENUE

57.     The jurisdiction of the Court arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq*.; 28 U.S.C. § 1331; and principles of pendent jurisdiction.

58.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

59.     This Court has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a), and the claim for declaratory relief based upon 28 U.S.C. § 2201 and § 2202.

60.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York C.P.L.R. § 302(a), this Court has personal jurisdiction over any non-domiciliary Defendant.

61.     Venue lies in this District Court under the provisions of 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND

62.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

63.     Under the Comprehensive Motor Vehicle Insurance Reparations Act of New York State, Ins. Law §§ 5101, *et seq*., Plaintiffs are required to pay, *inter alia*, for health service expenses that are incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

64.     The Pharmacy Defendants purportedly dispensed pharmaceutical products to Covered Persons for the purported treatment of soft tissue injuries, such as sprains and musculoskeletal pain, and submitted claims for payment to Plaintiffs for such services.

65.     In purported compliance with the No-fault Law and 11 N.Y.C.R.R. § 65, *et seq.*, the Defendants submitted proof of their claims to Plaintiffs using a "Verification of Treatment by Attending Physician or Other Provider of Health Service" or NF-3 form or a substantially similar form.

66.     Pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by the Defendants contained the following (or substantially similar) warning on the back of the claim form:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, may be guilty of a criminal act punishable under law and may be subject to civil penalties.

67.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process claims within 30 days of receipt of the proof of claim.

68.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Babadzhanova through Pristine RX in support of their claims for pharmaceutical products, and paid Defendants based on the representations and information that Defendants submitted to Plaintiffs.

69.     At all relevant times Pristine RX was an illegal enterprise that engaged in a common, systematic, and pervasive fraudulent practices.

70.     Pristine RX, which is purportedly owned, operated, and controlled by Babadzhanova, was part of a racketeering scheme that distinguished it from a legitimate healthcare provider/pharmacy as follows:

- Unlike legitimate pharmacies, Pristine RX routinely misrepresented that it was dispensing Topical Pain Products and other drugs pursuant to legitimate New York State Prescriptions, when it was not;

- Unlike legitimate pharmacies, Pristine RX dispensed pharmaceuticals to fill fraudulent and boilerplate prescription forms it received from the Prescribing No-fault Clinics pursuant to illicit kickback agreements;

- Unlike legitimate pharmacies, Pristine RX misrepresented that it was in conformance with material licensing requirements which would entitle it to reimbursement of No-fault benefits when, in fact, it was involved in collusive relationships with providers that issue illegal prescriptions pursuant to an unlawful kickback arrangement and/or other financial incentives;

- Unlike legitimate pharmacies, Pristine RX entered into kickback agreements with No-fault Clinics in order to generate a large volume of prescriptions pursuant to a fraudulent, pre-determined treatment and billing protocol whereby Covered Persons received Topical Pain Products and/or other oral medications irrespective of medical necessity.

71.     The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Babadzhanova engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to (i) issue prescriptions for large amounts of virtually identical Topical Pain Creams and other select oral medications to their patient population, and/or (ii) fabricate and/or fraudulently alter prescriptions, in order to conform the prescriptions to a predetermined course of treatment, irrespective of medical necessity;

- Submitted or caused to be submitted, on behalf of Pristine RX, numerous fraudulent claim forms seeking payment for Topical Pain Creams and other select oral medications that were purportedly (but not actually) provided to many Covered Persons;

17

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

72.     At all relevant times mentioned herein, Babadzhanova knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Topical Pain Creams and other select oral medications.

73.     At all relevant times mentioned herein, Babadzhanova, through Pristine RX, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

74.     At all relevant times mentioned herein, Babadzhanova and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

75.     In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded thousands of dollars per Covered Person.

**A.     The Fraudulent Prescription and Examination Reports**

76.     As a matter of pattern, practice and protocol, the Prescribing No-fault Clinics, in many cases, prescribed, or purported to prescribe, the Topical Pain Products and select other medications, including NSAIDs and muscle relaxers, pursuant to a predetermined protocol irrespective of medical necessity.

77.     In furtherance of this predetermined protocol and in order to further facilitate the fraud set forth herein, Defendants entered into agreements with one or more of the Prescribing No-

fault Clinics, Clinic Controllers, and prescribing providers to utilized generic, boilerplate examination reports specifically designed to justify the continued and voluminous use of medically unnecessary Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers.

78.     By way of example and not limitation, in many instances, the generic, boilerplate examination reports were pre-printed and routinely contained one or more of the following predetermined medications, with preset options for strength and/or directions on how often to take or apply the medications prescribed, which the prescribing providers could select by circling the name and strength of the medication on the generic, preprinted, boilerplate examination report:

> -Cyclobenzaprine 5/10mg
> -Naproxen 500mg
> -Ibuprofen 600/800mg
> -Lidocaine Ointment 5% 200/250mg
> -Somnicin 1-2 Capsule

79.     Exhibit "3" in the accompanying Compendium of Exhibits is a sampling of the generic, preprinted, boilerplate examination reports utilized by the No-fault Clinics, Clinic Controllers, and prescribing providers.

80.     The Prescribing No-fault Clinics, Clinic Controllers and prescribing providers would, in many instances, utilize generic, preprinted, boilerplate examination reports with preprinted medications designed to intentionally limit the pharmaceutical options available to Covered Persons to those which could reap Defendants the most profits, notwithstanding any perceived benefit or harm to Covered Persons.

81.     Moreover, the reliance upon generic, preprinted, boilerplate examination reports by No-fault Clinics, Clinic Controllers and/or prescribing providers renders the prescriptions

submitted by Defendants to Plaintiffs in violation of Section 910 of the Official Compilation of Codes, Rules and Regulations of the State of New York, which provides that:

- A "prescription shall be issued by a practitioner for legitimate medical purposes in good faith and in the course of his or her professional practice only. An order purporting to be a prescription that is not issued for legitimate medical purposes is not a prescription within the meaning of the New York State Education Law and the New York State Public Health Law and the person knowingly dispensing such an order, as well as the person issuing such order, shall be subject to all penalties provided in law or regulations." *See* 10 N.Y.C.R.R. § 910(2)(f).

82.     On information and belief, at all times relevant herein, the Defendants knew or should have known that the pre-printed, boilerplate evaluation forms were bogus.

83.     Demonstrative of the fact that the prescriptions based on the pre-printed, boilerplate evaluation forms were bogus, and that the pharmaceuticals were dispensed as part of a protocol of treatment, in numerous instances, the drugs were delivered to the patients, weeks, even months, after the medication was prescribed.  By way of example and not limitation:

- Covered Person RM (Claim No. 0651911067-01) was prescribed Lidocaine 5% ointment, Naproxen 500mg tablets, Omeprazole 20mg tablets, and Cyclobenzaprine HCL 10mg Tablets on December 13, 2021, but the medications were not delivered until January 3, 2022, twenty-one (21) days after the prescription.

- Covered Person JD (Claim No. 0653002378-01) was prescribed Lidocaine 5% ointment and Naproxen 550mg tabs on March 1, 2022, but the medications were not delivered until March 14, 2022, thirteen (13) days after the prescription.

- Covered Person FO (Claim No. 0653422394-02) was prescribed Lidocaine 5% ointment and Naproxen 550mg tabs on January 25, 2022, but the medications were not delivered until March 3, 2022, thirty-seven (37) days after the prescription.

- Covered Person GH (Claim No. 0654594274-01) was prescribed Lidocaine 5% ointment and Naproxen 550mg tabs on January 11, 2022, but the

medications were not delivered until February 13, 2022, thirty-three (33) days after the prescription.

- Covered Person WB (Claim No. 0655119808-02) was prescribed Celecoxib 200mg caps on January 7, 2022, but the medications were not delivered until January 27, 2022, twenty (20) days after the prescription.

**B.** **Overview of Laws and Regulations**

### *Overview of Guidelines for Topical Pain Products*

84. On information and belief, Topical Pain Products, such as Lidocaine 5% ointment, are a type of topical pain-relief drug that are "locally administered treatments."

85. The role of Topical Pain Products in pain management is not a scientifically proven fact. By way of example and not limitation, according to medical literature, due to the absence of specific compliance and adherence studies comparing topical treatment versus traditional routes in pain management, the role of topical preparations in patient adherence remains obscure.

86. Topical Pain Products should undergo trials, including in the case of topical lidocaine, a trial in the range of 2-4 weeks.

87. The ingredients used in the Topical Pain Products include NSAIDs, which is not always appropriate in some clinical settings. For example, it is well known that people who use NSAIDs (other than aspirin) may have a higher risk of having a heart attack or a stroke than people who do not use those medications, and these events may happen without warning and may even cause death.

88. The medical standard in reference to topical drug delivery, as presented in the Workers Compensation Board New York Non-Acute Pain Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 37-38; Current Edition, May 2, 2022, page 39), states the following: "For most patients, the effects of long-term use are unknown and thus may be better

21

used episodically.  These agents may be used in those patients who prefer topical treatments over oral medications."

89.     According to the latest Workers Compensation Board Medical Treatment Guidelines (First Edition, September 15, 2014, pages: 28-38; Current Edition, May 2, 2022, page 32) regarding Non-Acute Pain, "Topical, oral, and/or systemic compound medications are not recommended."

### *Overview of New York State Laws and Regulations Regarding Operations of Legitimate Pharmacies*

90.     Pursuant to New York State law, a provider of healthcare services is not entitled to reimbursement for No-fault Benefits if the provider fails to meet any applicable New York state or local licensing requirement necessary to perform such service in New York.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).

91.     New York Education Law § 6808, prohibits a person, firm, corporation, or association from possessing drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or offering drugs, prescriptions, or poisons for sale at retail or wholesale unless they are registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

92.     New York Education Law § 6530(38) prohibits a licensed physician from entering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of secret formula ("coded") or specially marked prescriptions.

93.     New York Education Law § 6810(7)(a) prohibits pharmacies from dispensing a drug when a prescription form for the drug includes any other drug.

94.     New York Education Law § 6810(9) prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

95.     New York Education Law § 6811 makes it a crime for any person to enter into an agreement with a physician (or other licensed healthcare provider) for the compounding or dispensing of coded prescriptions.

96.     New York Education Law § 6509-a prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

97.     8 N.Y.C.R.R. § 29.1(b)(3) prohibits a professional licensee from "directly or indirectly" offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.

98.     New York Education Law § 6530(18) prohibits a licensed physician from "directly or indirectly" offering, giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in exchange for patient referrals or in connection with the performance of professional services.

99.     New York Education Law § 6530(17) prohibits pharmacies and other health care professionals from "[e]xercising undue influence" over a patient, including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

100.    8 N.Y.C.R.R. § 29.1(b)(2) further provides that it constitutes professional misconduct when pharmacies or other health care professionals "exercise…undue influence" over a patient or client including by the "promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party."

101.    8 N.Y.C.R.R. § 63.6(b)(7) requires that pharmacists "conduct a prospective drug review before each prescription is dispensed or delivered to a patient or person authorized to act on behalf of the patient. Such review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

102.    New York Education Law § 6808(2)(c), requires that the "names of the owner or owners of a pharmacy shall be conspicuously displayed upon the exterior of such establishment. The names so displayed shall be presumptive evidence of ownership of such pharmacy by such person or persons."

103.    New York Education Law § 6808(e) requires that every pharmacy shall be under the immediate supervision and management of a licensed pharmacist.

104.    New York Education Law § 6808(e) provides that pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

105.    New York Education Law § 6808(e) provides that pharmacy owners are responsible "for the strength, quality, purity and the labeling thereof of all drugs, toxic substances, devices and cosmetics, dispensed or sold, subject to the guaranty provisions of this article and the public health law."

106.     New York Education Law § 6808(h) requires that individual applicants and all officers, directors, and shareholders with at least ten percent interest in corporate applicants "shall be over good moral character."

## MECHANICS OF THE SCHEME TO DEFRAUD

107.     Beginning in 2020 and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Topical Pain Products and other select oral medications, such as NSAIDs and muscle relaxers to Covered Persons.

108.     Defendant Babadzhanova, through Pristine RX, devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, by making material misrepresentations in bill submissions to Plaintiffs and fraudulently billing for Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, which were provided, if at all, irrespective of medical necessity, pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, and further, cost Defendants a fraction of the amounts that Defendants materially misrepresented in their fraudulent bill submissions to Plaintiffs.

109.     Defendants engaged in a massive scheme to defraud in which they, as a matter of pattern, practice and protocol, manufactured, dispensed, or caused to be dispensed, expensive Topical Pain Products, including Lidocaine 5% ointment, Lidocaine 5% pain patches and other specifically targeted, select oral medications, including NSAIDs and muscle relaxers, to Covered Persons irrespective of medical necessity.

110.     In 2015, the Department of Health and Human Services, Office of the Inspector General, issued a report noting the potential for fraud in abuse by pharmacies in New York related to the prescription, among other topical pain medications, diclofenac sodium 3% gel, and lidocaine

5% pain patches. *See Questionable Billing and Geographic Hotspots Point to Potential Fraud and Abuse in Medicare Part D,* OEI-02-15-00190 (June 2015).

111.    Moreover, in 2018, the U.S. Department of Health and Human Services, Office of the Inspector General, issued a report noting that fraud and abuse by pharmacies was significant in the prescribing and dispensing of lidocaine products.  *See Questionable Billing for Compounded Topical Drugs in Medicare Part D*, OEI-02-16-00440 (August 2018).

112.    Here, by way of example and not limitation, the Topical Pain Products and other select oral medications account for nearly all of the billing to Allstate from Pristine RX.

113.    Pristine RX purports to be a storefront pharmacy operating in Nassau County, New York, but does not advertise to the general public, have a website advertising its products or services, and does not otherwise market or seek business from individual patients.

114.    Instead, as part of their pattern, practice and protocol, and in furtherance of their massive scheme to defraud, Defendants entered into illegal, collusive agreements whereby the Pharmacy Defendants paid kickbacks to No-fault Clinics and Clinic Controllers in exchange for the No-fault Clinics' and prescribing providers' prescribing large volumes of the Topical Pain Products, including Lidocaine 5% ointment, and other select oral medications, including NSAIDs and muscle relaxers, which were specifically targeted for their high profit margins, and directing these prescriptions to be dispensed and billed by Pristine RX.

115.    In fact, a significant number of the billing that Pristine RX submitted to Plaintiffs for reimbursement of pharmaceuticals dispensed, if at all, to No-fault Claimants came from a few prescribing physicians or practices, with a history or engaging in fraudulent No-fault billing schemes.

116.    By way of example but not limitation, numerous fraudulent prescriptions submitted in claims for reimbursement from Pristine RX to Plaintiffs were issued by medical providers that

purportedly provided services through Macintosh Medical PC, a professional corporation in which Jonathan Landow ("Landow") is listed as the record owner and which operates out of several locations throughout the New York metropolitan area.  Landow and several of his professional corporations in which he is listed as the record owner, including Macintosh Medical P.C., have been sued by multiple No-fault insurance carriers for allegedly engaging in a multimillion-dollar fraud scheme involving, among other things, rendering healthcare services pursuant to fraudulent billing and treatment protocols and engaging in illegal kickback and referral arrangements. *See, e.g., Allstate Ins. Co., et al, v. Landow, M.D., et al.*, 24-cv-02010 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C., M.D., et al.*, 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. County).

117.    These Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, were prescribed and dispensed pursuant to a predetermined protocol that lacked individualized care, was designed to exploit patients for financial gain, was implemented without regard to pharmacologic outcomes and was implemented with gross indifference to a patient's health and safety.

**A.    Fraudulent Dispensing and Billing of Topical Pain Products Without Regard to Patient Care in Order to Exploit Patients for Financial Gain**

118.    As part of Defendants' scheme to defraud, Defendants entered into kickback or other financial arrangements with the Prescribing No-fault Clinics and/or prescribing providers, who instead of prescribing cheaper FDA-approved and/or commercially available medication to Covered Persons, would instead prescribe and/or dispense the Topical Pain Products, including Lidocaine 5% ointment, which were prescribed without regard to the efficacy and/or medical necessity of the drugs, and often combined these Topical Pain Products with prescriptions for other

27

select oral medications, including NSAIDs and muscle relaxers, increasing the risk for adverse events in the Covered Persons without any additional therapeutic benefit.

119.   Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the Prescribing No-fault Clinics, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the Prescribing No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements with Defendants, would prescribe Topical Pain Products and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a standard, predetermined protocol regardless of whether such pharmaceuticals were medically necessary.

120.   Such Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, were prescribed for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident and without first trying commercially available alternative medications that are FDA-approved and available at significantly less cost.

121.   In fact, pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, without the prescribing provider first taking a detailed patient history and without determining whether the Covered Person was currently taking any medications or suffering from any comorbidities.

122.   Pursuant to the standard, predetermined protocol, the Covered Persons were routinely prescribed the Topical Pain Products and/or other select oral medications, including NSAIDs and muscle relaxers, pursuant to a boilerplate, pre-printed examination reports and follow-up examinations designed to justify continued, voluminous and excessive use of prescribed

pharmaceuticals.  These reports rarely gave any indication as to why alternative FDA-approved and/or over-the-counter medications would not sufficiently address the Covered Person's condition.

123.   Irrespective of the needs of any individual Covered Person, the Prescribing No-fault Clinics prescribed the same pre-made, formulaic Topical Pain Products, which contained the exact same amount of simple ingredients, including Lidocaine 5% ointment, and/or other pharmaceuticals to each and every Covered Person.

124.   On information and belief, as part of the kickback or other financial compensation agreement with the Prescribing No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the Prescribing No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms in favor of Pristine RX, which, after execution, the prescribing No-fault Clinics would transmit to Pristine RX.

125.   In many if not all instances, the Prescribing No-fault Clinics never provided Covered Persons with the prescriptions for Topical Pain Product to be filled at a pharmacy chosen by the Covered Persons.  Rather, the Covered Persons were given the Topical Pain Products at the Prescribing No-fault Clinics without even being given the prescription, or in some instances, being told that such medication was being prescribed, to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate pharmacy.

126.   On information and belief, the prescriptions for Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, were filled by Pristine RX as part of illicit and collusive arrangements whereby, in exchange for issuing such prescriptions, the

referring No-fault Clinics, Clinic Controllers and/or prescribing providers received illegal payments from Defendants.

127.    At all times relevant herein, Pristine RX, as well as the No-fault Clinics, Clinic Controllers and prescribing providers, knew that there were effective, commercially available, FDA-approved and cheaper medications which would have been suitable to prescribe to Covered Persons, and that the Topical Pain Products and/or other select oral medications, including NSAIDs and muscle relaxers, were being prescribed solely to enrich Defendants, the Prescribing No-fault Clinics and Clinic Controllers.

128.    In doing so, and as a result of Defendants' collusive agreements with Prescribing No-fault Clinics, Clinic Controllers and prescribing providers, Defendants promoted the sale of the Topical Pain Products and other select oral medications over effective, commercially available, FDA-approved, cheaper alternatives, and thereby exercised undue influence over the Covered Persons in order to exploit the Covered Persons for their own financial gain.

129.    Demonstrative that the No-fault Clinics prescribed the Topical Pain Products in order to exploit the patient for financial gain, irrespective of medical necessity and without regard to genuine patient care, in virtually every instance, the Prescribing No-fault Clinics routinely:

- Failed to document in the Covered Persons' initial or follow-up evaluation reports why the Topical Pain Product was medically necessary;

- Failed to document a detailed medical history in Covered Persons' initial or follow-up evaluation reports, thereby failing to fully examine or document potential contraindications or comorbidities;

- Failed to document in Covered Persons' initial or follow-up evaluation reports why commercially available over-the-counter, FDA approved medications could not be prescribed instead of the Topical Pain Product; and/or

- Failed to document in Covered Persons' follow-up reports if the Topical Pain Product was used by Covered Persons, and if so, was medically beneficial.

130.    Defendants engaged in the scheme to defraud alleged herein when they knew, or should have known, that substantially cheaper and commercially available FDA-approved medications proven to have therapeutic effects were available.

131.    The Topical Pain Products, including in the form of Lidocaine 5% ointment, could have and should have been replaced with cheaper, over-the-counter and readily available substitutes that have substantially similar, if not identical, indications and effects.

132.    The Topical Pain Products such as those dispensed by Pristine RX should be a final treatment option after oral medications and other commercially available, over-the-counter, FDA-approved topical creams are ineffective or not tolerated by patients.

### *Topical Lidocaine Pain Ointment*

133.    In order to facilitate the fraud set forth herein, Covered Persons at the Prescribing No-Fault Clinics were routinely prescribed another particular Topical Pain Product, in the form of topical Lidocaine 5% ointment, at voluminous rates and directed to have this prescription filled and dispensed (if at all) by Pristine RX, pursuant to Defendants' illicit, collusive arrangements with the Prescribing No-fault Clinics, Clinic Controllers and/or prescribing providers, in order to maximize profits, at the expense of genuine patient care, medical necessity or pharmacological outcome.

134.    Pristine RX rarely billed Plaintiffs for any formulation of topical Lidocaine other than Lidocaine 5% ointment.  The fact that Lidocaine was routinely dispensed and billed by Pristine RX almost exclusively in this specific formulation demonstrates a lack of individualized patient care.

135.    Lidocaine is a local anesthetic used to relieve neuropathic pain of post-herpetic neuralgia, also referred to as after-shingles pain, and to relieve skin irritations such as minor burns, sunburn, abrasions of the skin, insect bites and hemorrhoids.

136.   According to New York State Workers' Compensation Board, Non-Acute Pain Medical Treatment Guidelines, (First Edition, September 15, 2014, page 38; August 25, 2021 Update, effective May 2, 2022, page 39), New York State Workers' Compensation Board, Mid and Low Back Injury, (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 38) and the New York State Workers' Compensation Board, Neck Injury, (First Edition, September 15, 2014; August 25, 2021 Update, effective May 2, 2022, page 34): "Topical lidocaine is only indicated when there is documentation of a diagnosis of neuropathic pain.  In this instance, a trial for a period of no greater than four weeks can be considered, with the need for documentation of functional gains as criteria for additional use."

137.   The prescribing providers routinely failed to document any functional deficit that could be managed by topical Lidocaine or a contraindication to use oral medications, demonstrating that the Lidocaine 5% ointment was routinely dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

138.   By way of example and not limitation, Lidocaine 5% ointment was prescribed to Covered Persons, dispensed by Pristine RX and billed to Plaintiffs for reimbursement in the following instances where the examination reports recorded no incidence of neuropathic pain or any functional deficit appropriate for the prescription:

- Covered Person CC (Claim No. 0652876764-01) was allegedly involved in a motor vehicle accident on December 18, 2021.  Thereafter, on December 22, 2021, CC presented to Zakaria Medical Services PC (not named a defendant in the Complaint) for a comprehensive medical consultation, the report for which only included diagnoses of sprain of ligaments of lumbar spine, i.e., no neuropathic pain.  Regardless, Pristine RX billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment pursuant to a prescription allegedly issued by Dr. Muhammad R. Zakaria, MD (not named a defendant in the Complaint) on December 22, 2021.

- Covered Person JHK (Claim No. 0643589427-01) was allegedly involved in a motor vehicle accident on September 9, 2021. Thereafter, JHK presented to Robert Riselvato, RPA-C (not named a defendant in the Complaint) of Clinton Medical Office, PC (not named a defendant in the Complaint) on January 25, 2022, whose findings only included rotator cuff tear, left shoulder, i.e., no neuropathic pain. Regardless, Dr. Riselvato prescribed Lidocaine 5% ointment, which was dispensed by Pristine RX and billed to Plaintiffs.

139. Even if initial or follow-up evaluation reports by the prescribing provider listed any genuine patient need for lidocaine ointment, which it often did not, the reports routinely failed to include any potential reason why prescription Lidocaine 5% ointment was medically necessary above and beyond a substantially similar and/or lower strength alternatives that were FDA-approved and commercially available at a fraction of the cost, such as Aspercreme, Icy Hot and Bengay.

140. Pristine RX billed $3,805.00 for Lidocaine 5% ointment. However, over-the-counter alternatives, such as Aspercreme and Icy Hot, are commercially available at a retail cost of less than $20 and contain Lidocaine 4%.

141. Despite this disparity in cost for a substantially similar product, on information and belief, Pristine RX regularly dispensed and billed for Lidocaine 5% ointment without any indication in the examination reports that the patient first tried any commercially available alternative, even for minor sprains.

142. By way of example and not limitation, Pristine RX dispensed Lidocaine 5% ointment for Covered Persons and submitted bills to Plaintiffs for reimbursement even though the evaluation reports and/or other documentation in support of this billing demonstrated no medical necessity for Lidocaine 5% ointment instead of Lidocaine 4% ointment or any indication that the significantly cheaper, commercially available alternative was considered:

- Covered Person JD (Claim No. 0653002378-01) was allegedly involved in a motor vehicle accident on December 20, 2021. Thereafter, JD presented to Pauline Raitses DO (not named a defendant in the Complaint) of Briyut Medical PC (not named a defendant in the Complaint) on December 21, 2021. Even though Dr. Raitses' report made no mention of JD having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX pursuant to a prescription allegedly issued by Dr. Raitses on December 21, 2021.

- Covered Person FO (Claim No. 0653422394-02) was allegedly involved in a motor vehicle accident on December 11, 2021. Thereafter, FO presented to Pauline Raitses DO (not named a defendant in the Complaint) of Briyut Medical PC on December 21, 2021. Even though the evaluation report made no mention of FO having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX pursuant to a prescription allegedly issued by Dr. Raitses on December 21, 2021.

- Covered Person DF (Claim No. 0653422394-3 ) was allegedly involved in a motor vehicle accident on December 11, 2021. Thereafter, DF presented to Pauline Raitses DO (not named a defendant in the Complaint) of Briyut Medical PC (not named a defendant in the Complaint) on December 11, 2021. Even though the evaluation report made no mention of FO having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX.

- Covered Person AB (Claim No. 1075029-01) was allegedly involved in a motor vehicle accident on December 21, 2021. Thereafter, AB presented to Pauline Raitses, OD (not named a defendant in the Complaint) of Briyut Medical PC (not named a defendant in the Complaint) on January 4, 2022. Even though Dr. Raitses' report made no mention of AB having first tried any lower dosage of Lidocaine ointment, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX pursuant to a prescription allegedly issued by Dr. Raitses on January 4, 2022.

- Covered Person GV (Claim No. 0659370167-02) was allegedly involved in a motor vehicle accident on February 7, 2022. Thereafter, GV presented to Ayman Farag MD (not named a defendant in the Complaint) at Patient Fusion (not named a defendant in the Complaint) on March 4, 2022. Dr. Farag's evaluation report made no mention of GV having first tried any lower dosage of Lidocaine ointment. Nevertheless, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX pursuant to a prescribed allegedly issued by Dr. Farag on March 4, 2022.

- Covered Person RA (Claim No. 0661923722-01) was allegedly involved in a motor vehicle accident on February 28, 2022. Thereafter, RA presented to Morzoor Mahboob (not named a defendant in the Complaint) at Quazi R

Medical Services PC (not named a defendant in the Complaint) on March 8, 2022. Mahboob's evaluation report made no mention of RA having first tried any lower dosage of Lidocaine ointment. Nevertheless, Lidocaine 5% ointment was prescribed and dispensed by Pristine RX pursuant to a prescribed allegedly issued by Mahboob on March 8, 2022.

143. Additionally, Pristine RX also routinely dispensed and billed Plaintiffs for reimbursement of Lidocaine 5% ointment despite the fact that it was prescribed concurrently with oral medications, such as NSAIDs and muscle relaxers in order to maximize profits without regard for patient care. By way of example and not limitation, Pristine Rx submitted supporting documentation to Plaintiffs for reimbursement of Lidocaine 5% ointment concurrently with other medications in the following instances:

- Covered Person BB (Claim No. 0649996319-05) was allegedly involved in a motor vehicle accident on November 13, 2021. Thereafter, Pristine RX billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Naproxen 500mg and muscle relaxant Cyclobenzaprine 15mg on January 6, 2022, pursuant to prescriptions allegedly issued by Mohammed Zakaria MD.

- Covered Person KT (Claim No. 0649996319-07) was allegedly involved in a motor vehicle accident on November 13, 2021. Thereafter, KT presented to Mohammed Zakaria MD (not named a defendant in the Complaint) of Zakaria Medical Service PC (not named a defendant in the Complaint) on December 21, 2021. Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Ibuprofen 800mg and muscle relaxant Cyclobenzaprine 15mg on December 28, 2021, pursuant to prescriptions allegedly issued by Dr. Zakaria on December 21, 2021.

- Covered Person JA (Claim No. 0650522055-03) was allegedly involved in a motor vehicle accident on November 11, 2021. Thereafter, JA presented to Aleksandr Kopach, PA (not named a defendant in the Complaint) of Macintosh Medical PC (not named a defendant in the Complaint) on November 15, 2021. Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Ibuprofen 800mg and muscle relaxant Tizanidine 4mg pursuant to prescriptions allegedly issued by Dr. Kopach on December 27, 2021.

- Covered Person JHK (Claim No. 0643589427-01) was allegedly involved in a motor vehicle accident on September 9, 2021. On January 25, 2022, JHK sought treatment at Clinton Medical Office PC (not named a defendant

in the Complaint). Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Meloxicam 7.5mg pursuant to a prescription allegedly issued by Robert Riselvate RPA-C (not named a defendant in the Complaint) on January 31, 2022.

- Covered Person CC (Claim No. 0652876764-01) was allegedly involved in a motor vehicle accident on December 18, 2021. CC sought treatment at Zakaria Medical Service PC (not named a defendant in the Complaint) on December 22, 2021. Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Naproxen Sodium 500mg and muscle relaxant Cyclobenzaprine 15mg pursuant to a prescription allegedly issued by Mohammed Zakaria MD (not named a defendant in the Complaint) on December 22, 2021.

- Covered Person WB (Claim No. 0655119808-02) was allegedly involved in a motor vehicle accident on December 14, 2021. Thereafter, WB presented to Joseph Jimenez MD (not named a defendant in the Complaint) at J Sports Medicine PC (not named a defendant in the Complaint) on January 26, 2022. Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Ibuprofen 600mg to WB pursuant to a prescription allegedly issued by Dr. Jimenez on January 26, 2022.

- Covered Person SK (Claim No. 0663397692-01) was allegedly involved in a motor vehicle accident on February 28, 2022. Thereafter, SK presented to Mohammad Hasanuzzaman MD (not named a defendant in the Complaint) of Hasanuzzaman Medical Care, PC (not named a defendant in the Complaint) on March 2, 2022. Pristine RX then billed Plaintiffs for allegedly dispensing Lidocaine 5% ointment simultaneously with NSAID Naproxen 550mg to SK pursuant to a prescription allegedly issued by Dr. Hasanuzzaman on March 2, 2022.

144. Furthermore, by way of example and not limitation, the Appendix to the Complaint, identifies a representative sample of predicate acts, including claim nos. 0643589427-01, 0649996319-05, 0650330533-01, 0650465594-02, 0651211633-01, 0654364777-02, 0654594274-01, 0658598288-02, and 0661923722-01, in which Pristine RX mailed fraudulent claims for simultaneously dispensing Lidocaine 5% ointment and an oral NSAID with or without an oral muscle relaxant, that were supplied pursuant to the fraudulent protocol of treatment described herein, in exchange for kickbacks and/or other financial compensation agreements, for

medically unnecessary pharmaceuticals in order to exploit and manipulate the payment formulas under the applicable Fee Schedule to maximize the charges that they could submit to Plaintiffs.

145.    Moreover, Lidocaine 5% ointment is not without risks or side effects, and the increased dosage at which the Prescribing No-fault Clinics and prescribing providers prescribed the Lidocaine increases the risk of the side effects associated with the medication.

146.    Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest.

147.    Patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams, and no more than 20 grams of ointment should be used in a single day. However, any maximum dosage was virtually never included on the prescriptions purportedly filled by Pristine RX, which instead, routinely instructed patients to apply 2-3 times per day to the affected area, as needed.

148.    By engaging in a fraudulent scheme whereby Lidocaine 5% ointment was routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength, FDA-approved commercially available products, and without indication on the prescriptions as to safe dosage, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

149.    Pristine RX was not and is not entitled to any reimbursement from Plaintiffs for the Lidocaine 5% ointment.

150.    The bills mailed by Pristine RX were fraudulent in that they misrepresented that (i) the Lidocaine 5% ointment were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were

prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidocaine 5% ointment that they were not entitled to receive under the No-fault law and implementing regulations.

151.    Defendants' activities described herein with respect to the Lidocaine 5% ointment promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

### ***Fraudulent Dispensing of Pain Patches***

152.    In addition to fraudulently dispensing Lidocaine 5% ointment, the Defendants, as a matter of pattern, practice, and protocol, and in furtherance of the fraudulent scheme alleged herein, routinely dispensed Lidocaine 5% pain patches to Covered Persons based upon a collusive pre-determined treatment protocol whereby the Prescribing No-fault Clinics would prescribe Patches irrespective of medical necessity.

153.    On information and belief, the acute stages after soft tissue trauma such as that purportedly sustained by Covered Persons include an inflammatory process that is usually controlled by systemic oral non-steroidal anti-inflammatory medications that are already proven to be potent in controlling inflammations and symptoms of pain, combined by a course of conservative therapy program that include several modalities and exercise program.

154.     On information and belief, to the extent that oral non-steroidal anti-inflammatory medications are not effective as a first-line treatment or are contraindicated, over-the-counter pain patches may be used in an attempt to offer pain relief.

155.     As part of the scheme to defraud alleged herein, the Prescribing No-fault Clinics routinely prescribed expensive pain patches to Covered Persons notwithstanding that the prescribing doctors failed to document that oral pain medication was contradicted or failed as a first-line therapy.

156.     By way of example and not limitation, the Prescribing No-fault Clinics routinely prescribed Lidocaine 5% Patches, which are topical analgesic patches that can purportedly be used to temporarily relieve minor muscle and joint pains.

157.     The Prescribing No-fault Clinics routinely failed to document any functional deficit that could be managed by Lidocaine or a contraindication to use oral medications, demonstrating that the lidocaine patches were dispensed as part of an illegal kickback arrangement in furtherance of the scheme to defraud alleged herein.

158.     Pristine RX, as a matter of pattern, practice and protocol, routinely billed Plaintiffs for Lidocaine Patches in boxes of thirty (30) patches for between $308.40 per box and boxes of sixty (60) patches for between $616.20 and $1,232.40 per box.

159.     However, over-the-counter alternatives containing Lidocaine 4%, such as Aspercreme and Icy Hot, are commercially available at a retail cost of no more than $12.00 for a box of 5 patches, the equivalent of $72 for thirty (30) patches, $144 for sixty (60) patches, or $216 for ninety (90) patches.

160.     By engaging in a fraudulent scheme whereby Lidocaine Patches were routinely prescribed without medical necessity, instead of (and without first prescribing) lower-strength,

FDA-approved commercially available products, Defendants placed their financial gain above genuine patient care and demonstrated a gross indifference to a patient's health and safety.

161.    The bills mailed by Pristine RX were fraudulent in that they misrepresented that (i) the Lidocaine Patches were medically necessary when in fact they were not; (ii) they were provided pursuant to legitimate prescriptions when in fact they were not; and (iii) they were prescribed by legitimate medical providers when in fact they were provided pursuant to illegal kickback and/or financial compensation arrangements with No-Fault Clinics. In these and numerous other ways alleged herein, the Pharmacy Defendants designed and executed a fraudulent blueprint to bill and obtain payments from Plaintiffs for expensive Lidocaine Patches that they were not entitled to receive under the No-fault law and implementing regulations.

162.    On information and belief, Pristine RX was not and is not entitled to any reimbursement from Plaintiff for the pain patches identified on the Fraudulent Prescription in general, and Lidocaine Patches in particular.

**B.      Defendants' Scheme was Designed to Maximize Their Financial Gain**

163.    Defendants targeted Lidocaine 5% ointment and Lidocaine 5% Pain Patches to be part of the Topical Pain Products routinely prescribed pursuant to the fraudulent scheme set forth herein because Pristine RX could readily purchase Lidocaine 5% ointment and patches at a low cost but bill out the Topical Pain Products at egregiously high wholesale prices based on the Pharmacy Fee Schedule.

164.    Pursuant to the Pharmacy Fee Schedule governing topical pain products, Pristine RX was entitled to the average wholesale price (AWP) minus 12% (for brand name drugs) or 20% (for generic drugs) for each ingredient within the cream, together with a nominal dispensing fee.

165. In connection with Pristine RX's request for reimbursement from Plaintiffs, Pristine RX typically submitted an NF-3 form, which included the purported NDC numbers and corresponding charges for each drug product dispensed.

166. The NDC numbers listed on the NF-3 form submitted by Pristine RX are what identified the purported AWPs for each of the Topical Pain Products and other select oral medications that Pristine RX purported to dispense.

167. Defendants never submitted wholesale purchase invoices to Plaintiffs demonstrating how much Pristine RX actually paid the suppliers for Topical Pain Products and other select oral medications, including NSAIDs, and muscle relaxers, or whether Pristine RX actually purchased the pharmaceuticals with the NDC numbers listed in the billing submissions.

168. On information and belief, the illegal kickback and referral arrangements Defendants entered into with No-fault Clinics, Clinic Controllers and HCPs targeting these specific Topical Pain Products and other select oral medicals, including NSAIDs, and muscle relaxers, was motivated by profit maximization rather than genuine patient care.

169. Defendants' activities described herein with respect to the Topical Pain Products and other select oral medications, including NSAIDs, and muscle relaxers, which were prescribed pursuant to a fraudulent scheme and pursuant to illegal, collusive kickback arrangements, promoted and facilitated other acts that imposed foreseeable costs onto Plaintiffs, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, IMEs, and peer reviews.

## DISCOVERY OF THE FRAUD

170. To induce Plaintiffs to promptly reimburse their claims for the Topical Pain Creams, Defendants have gone to great lengths to systematically conceal their fraud. By way of example and not limitation:

- Babadzhanova, through Pristine RX, routinely and deliberately submitted facially valid claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Babadzhanova, through Pristine RX, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Babadzhanova, through Pristine RX, knowingly misrepresented and concealed that Pristine RX's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement.

171. Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $105,000.00 based upon the fraudulent bill submissions.

172. Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered the fraud until in or about June 2023.

## STATEMENT OF CLAIMS

## FIRST CLAIM FOR RELIEF

## AGAINST BABADZHANOVA, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C § 1962(c))

173.    The allegations of paragraphs 1 through 172 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

174.    From in or about 2020 through the filing of this Complaint, Defendant Babadzhanova and one or more of the John Does 1 through 5 and ABC Corporations 1 through 5 conducted and participated in the affairs of the Pristine RX enterprise through a pattern of racketeering activity, including the many acts of mail fraud described herein and in the representative list of predicate acts, annexed hereto, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

175.    At all relevant times mentioned herein, Defendant Babadzhanova participated in the affairs of the Pristine RX enterprise through continuing a pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the dispensing of pharmaceutical products, including but not limited to Topical Pain Products and/or select other oral medications, such as NSAIDs and muscle relaxers, (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) were the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

176.     One or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5 participated in the scheme by ensuring that the No-Fault Clinics provided the Pristine RX enterprise with a steady and ample supply of fraudulent prescriptions for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Products, and oral NSAIDS, muscle relaxants and other pain medications, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, as well as bogus documentation, that misrepresented necessity of the pharmaceutical products to facilitate the fraudulent billing alleged in the Complaint.   One or more of the ABC Corporations furnished documents that Defendant Babadzhanova required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent pharmaceutical claims.

177.     It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics or Clinic Controllers, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

178.     The racketeering acts set forth herein were carried out on a continued basis for more than a three-year period, were related and similar, and were committed as part of the ongoing scheme of Babadzhanova, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, to fraudulently bill pharmaceutical products, including but not limited to Topical Pain Products and/or select oral medications, including NSAIDs and muscle relaxers, to defraud insurers and, if not stopped, will continue into the future.

179. This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, inasmuch as the Pristine RX enterprise continues to pursue collection on the fraudulent billing to the present day.

180. As a part of the pattern of racketeering activity, and for the purpose of executing the scheme and artifice to defraud as described above, Babadzhanova, with the knowledge and intent of one or more of the John Does 1 through 5 and one or more of the ABC Corporations 1 through 5, caused mailings to be made through the United States Postal Service, in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Allstate and to induce it to issue checks to Pristine RX based upon materially false and misleading information.

181. Through the Pristine RX enterprise, Babadzhanova submitted fraudulent claim forms seeking payment for pharmaceutical products, including but not limited to Topical Pain Products and other select oral medications, such as NSAIDs and muscle relaxers, that were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements that were the product of illegal and/or invalid prescriptions. The bills and supporting documents that were sent by and/or on behalf of Babadzhanova and/or others acting under his direction and control, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Babadzhanova, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5 engaged in a continuous series of predicate acts of mail fraud.

182.     A sample list of predicate acts is annexed hereto which identifies the nature and date of mailings that were made by or on behalf of Babadzhanova in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

183.     Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(b).

184.     Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**<u>Damages</u>**

185.     By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property, in an amount in excess of $105,000.00, the exact amount to be determined at trial.

186.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover, from Babadzhanova, one or more of the John Does 1 through 5, and one or more of the ABC Corporations 1 through 5, three-fold damages sustained by them, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**<u>AGAINST PRISTINE RX AND BABADZHANOVA</u>**

**(Common Law Fraud)**

187.     The allegations of paragraphs 1 through 172 are hereby repeated and re-alleged as though fully set forth herein.

188.     Defendants Pristine RX and Babadzhanova intentionally, knowingly, fraudulently, and with an intent to deceive Plaintiffs, made numerous false and misleading statements of material

46

fact as to the necessity and price of the pharmaceutical products which they purportedly dispensed, thereby inducing Plaintiffs to make payments to Defendants that Defendants were not entitled to because of their fraudulent nature.   As part of the fraudulent scheme implemented by Babadzhanova, Pristine RX made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

189.    Defendants Pristine RX and Babadzhanova intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the bills submitted to them for reimbursement of No-fault benefits for services relating to the dispensing of pharmaceutical products, including but not limited to the Topical Pain Products and select other oral medications, including NSAIDs and muscle relaxers, were misrepresented.

190.    Defendants Pristine RX and Babadzhanova intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the pharmaceutical products which they purportedly dispensed, including but not limited to the Topical Pain Products and select other oral medications, including NSAIDs and muscle relaxers, were dispensed (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) as the product of illegal and/or invalid prescriptions issued pursuant to collusive agreements.

191.    Defendants Pristine RX and Babadzhanova intentionally, knowingly, fraudulently, and with the intent to commit and facilitate billing fraud and deceive Plaintiffs, concealed the fact that the services were provided pursuant to a protocol that was intended to maximize Defendants' profits and reimbursements of payments from Plaintiffs, as opposed to medical necessity.

192.     Defendants Pristine RX and Babadzhanova intentionally, knowingly, fraudulently, and with the intent to deceive, submitted, or caused to be submitted to Plaintiffs, patient medical records, assignments of benefits, prescriptions, reports, treatment verifications and/or bills for medical treatment which contained false representations of material facts, including but not limited to the following fraudulent material misrepresentations:

- False and misleading statements that Pristine RX was dispensing Topical Pain Products and select oral medications, including NSAIDs and muscle relaxers, pursuant to legitimate New York State Prescriptions, when it was not;

- False and misleading statements that Pristine RX was billing Plaintiffs the maximum permissible charges under the No-fault Law for the Topical Pain Products and select other oral medications, including NSAIDs and muscle relaxers, allegedly provided to Covered Persons, when it was not;

- False and misleading statements that Pristine RX was in conformance with core licensing requirements and entitled to receive No-fault benefits when in fact Defendants participated in collusive relationships with medical providers through which Defendants filled prescriptions pursuant to an illegal kickback and referral scheme for medically unnecessary pharmaceuticals;

- False and misleading statements as to why the Topical Pain Products and select oral medications, including NSAIDs and muscle relaxers, were medically necessary; and

- False and misleading statements regarding the availability of over-the-counter, FDA approved medications in lieu of Topical Pain Products and select oral medications that were purportedly provided by Defendants as part of a predetermined protocol of treatment.

193.     In numerous instances, the medical records, reports, prescriptions, and bills submitted, or caused to be submitted, by Defendants Pristine RX and Babadzhanova to Plaintiffs in connection with Defendants' requests for reimbursement contained false representations which were intended not only to defraud Plaintiffs but constituted a grave and serious danger to the Covered Persons and the consumer public.

194.    The foregoing was intended to deceive and mislead Plaintiffs into believing that Babadzhanova, through Pristine RX, was providing medically necessary Topical Pain Products and other select oral medications, including NSAIDs and muscle relaxers, when, in fact, they were not.

195.    Defendants knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

196.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations, which they were led to believe as a result of Defendants Pristine RX and Babadzhanova' s acts of fraud and deception.

197.    Had Plaintiffs known of the fraudulent content of, and misrepresentations within the documentation and bills submitted to them, Plaintiffs would not have paid Pristine RX's claims for No-fault insurance benefits submitted in connection therewith.

198.    Furthermore, Defendants Pristine RX and Babadzhanova' s far-reaching pattern of fraudulent conduct evinces a high degree of moral turpitude and wanton dishonesty which, as alleged above, has harmed, and will continue to harm, the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

199.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $105,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

## THIRD CLAIM FOR RELIEF

## <u>AGAINST PRISTINE RX AND BABADZHANOVA</u>

### (Unjust Enrichment)

200.    The allegations of paragraphs 1 through 172 are hereby repeated and re-alleged as though fully set forth herein.

201.    By reason of their wrongdoing, Defendants have been unjustly enriched, in that they have, directly and/or indirectly, received monies from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

202.    Plaintiffs are therefore entitled to restitution from Defendants in the amount by which Defendants have been unjustly enriched.

203.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount in excess of $105,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

## FOURTH CLAIM FOR RELIEF

## <u>AGAINST PRISTINE RX</u>

### (Declaratory Judgment under 28 U.S.C. § 2201)

204.    The allegations of paragraphs 1 through 172 are hereby repeated and re-alleged as though fully set forth herein.

205.    At all relevant times mentioned herein, each and every bill mailed by Babadzhanova, through Pristine RX, to Plaintiffs sought reimbursement for medically unnecessary "pain relieving" pharmaceutical products, including Topical Pain Products and a limited variety of other oral medications.

206.    At all times relevant herein, the Defendants Pristine RX and Babadzhanova exploited the No-fault Law through the utilization of various deceptive billing tactics engineered

to maximize the amount of reimbursement from insurers, in general, and Allstate, in particular, through the submission of fraudulent billing pursuant to an unlawful kickback/referral arrangement.

207.    At all relevant times mentioned herein, each and every bill mailed by Pristine RX to Plaintiffs sought reimbursement for Topical Pain Products and/or select other oral medications, including NSAIDs and muscle relaxers, that were dispensed: (i) pursuant to an illegal kickback scheme and/or in exchange for other financial incentives; (ii) pursuant to a pre-determined protocol without regard for medical necessity; (iii) in violation of New York State laws regarding the legal operation of pharmacies and dispensing of pharmaceuticals; and/or (iv) pursuant to collusive agreements and the product of illegal and/or invalid prescriptions.

208.    Because Pristine RX engaged in the conduct alleged herein, Plaintiffs seek a declaration that they are not required to pay any of Pristine RX's claims for Topical Pain Products and/or select oral medications, including NSAIDs and muscle relaxants, which were dispensed pursuant to the scheme to defraud alleged herein.

209.    As the Defendants Pristine RX and Babadzhanova have knowingly made the foregoing false and fraudulent misrepresentations about the pharmaceuticals purportedly provided to Covered Persons and the amounts they were entitled to be reimbursed, it is respectfully requested that this Court issue an order declaring that Pristine RX is not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims, and Plaintiffs, therefore, are under no obligation to pay any of Pristine RX's No-fault claims.

210.    The Defendants Pristine RX and Babadzhanova will continue to seek reimbursement from Plaintiffs for their false and fraudulent claims absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted

unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

211.    Plaintiffs have no adequate remedy at law.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE,** Allstate demands judgment as follows:

i)      Compensatory damages, in an amount in excess of $105,000.00 the exact amount to be determined at trial, together with prejudgment interest;

ii)     Punitive damages in such amount as the Court deems just;

iii)    Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)      Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief declaring that Plaintiffs have no obligation to pay any of Defendants' unpaid claims for Topical Pain Products and/or select oral medications, whether pending, previously denied and/or submitted, regardless of whether such unpaid claims were ever denied, and regardless of the purported dates of service;

vii)    Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York
        September 18, 2024

MANNING & KASS, ELLROD, RAMIREZ,
   TRESTER LLP


By: _/s/  Lee Pinzow_____
     Robert A. Stern
     James A. McKenney
     Lee Pinzow
     Madison Forsander

     100 Wall Street, Ste 700
     New York, New York 10005
     (212) 858-7769

     *Attorneys for Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

                            **Plaintiffs,**

       **-against-**

PRISTINE RX CORP, MARGARITA BABADZHANOVA, JOHN DOES 1 THROUGH 5, AND ABC CORPORATIONS 1 THROUGH 5,

                            **Defendants.**

---

CIVIL ACTION

24-CV-6585

COMPLAINT

(JURY TRIAL DEMANDED)

# COMPLAINT

---

**MANNING & KASS, ELLROD, RAMIREZ, TRESTER LLP**
**ATTORNEYS FOR PLAINTIFFS**
**100 WALL STREET, SUITE 700**
**NEW YORK, NEW YORK 10005**
**TELEPHONE: (212) 858-7769**